TOWNSEND AND TOWNSEND AND CREW LLP
SUSAN M. SPAETH (State Bar No. 142652)
379 Lytton Avenue
Palo Alto, CA 94301
Telephone: (650) 326-2400
Facsimile: (650) 326-2422
Email: smspaeth@townsend.com

Attorneys for Respondent
TENAXIS MEDICAL, INC.

townsend.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CRYOLIFE, INC.,

Petitioner,

v.

TENAXIS MEDICAL, INC.,

Respondent.

Case No. C08-05124 HRL

**TENAXIS MEDICAL, INC.'S OPPOSITION TO CRYOLIFE, INC.'S MOTION TO COMPEL**

Date: May 5, 2009
Time: 10:00 a.m.
Courtroom: 2

Honorable Howard R. Lloyd

**PUBLIC VERSION**

TABLE OF CONTENTS

Page(s)

I. STATEMENT OF ISSUES TO BE DECIDED ..... 1

II. INTRODUCTION ..... 1

III. STATEMENT OF THE RELEVANT FACTS ..... 3

A. Status of the German Action ..... 3

B. Tenaxis' Complete Production and Deposition ..... 3

C. CryoLife's March 3 Tactics ..... 6

D. CryoLife's So-Called Meet and Confer Process ..... 7

E. Tenaxis' Additional Productions and Agreements ..... 8

IV. ARGUMENT ..... 11

A. Tenaxis Has Fully Complied With CryoLife's Discovery Requests and the Court's Order ..... 11

B. CryoLife is the Cause of Any Discrepancies Between What It Now Seeks and What It Originally Requested ..... 12

C. CryoLife Improperly Seeks to Equate "Relevance to the German Action" With the Scope of its Original Request ..... 14

V. CONCLUSION ..... 15

townsend.

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Detoy v. City and County of San Francisco*,
196 F.R.D. 362 (N.D. Cal. 2000) ........ 14

*PostX Corporation v. Secure Data Motion, Inc.*,
2005 WL 767593 (N.D. Cal.) ........ 14, 15

**Statutes**

28 U.S.C. § 1782 ........ 3, 7, 8, 11

**Rules**

Fed. R. Civ. P. Rule 30 ........ 12

Fed. R. Civ. P. Rule 34 ........ 12

townsend.

townsend.

## I. STATEMENT OF ISSUES TO BE DECIDED

In this miscellaneous action, CryoLife has moved to compel and for sanctions based on the faulty premise that its original document request for “documents sufficient to show” – and its corresponding deposition topic – really meant documents showing “all known details” of the various parameters and each of the underlying components of the final composition of ArterX, none of which were delineated to Tenaxis before March 3 or to this Court before these motions. CryoLife’s motions are unfounded.

Tenaxis produced all documents originally requested, and further provided a witness to testify as to the requested deposition topics. Thus, Tenaxis has fully complied with the Court’s January 13, 2009 Order. CryoLife now asserts Tenaxis’ document production and deposition testimony were insufficient as to one of the three requests and topics ordered. However, CryoLife did not alert Tenaxis to CryoLife’s belief that Tenaxis’ production was insufficient until the March 3 deposition had begun, making it a trying deposition. Nevertheless, Tenaxis has attempted to understand the scope of documents CryoLife now wants, and has searched for and produced additional documents to CryoLife. Further, Tenaxis has agreed to produce a second, technical deponent to CryoLife. Thus, Tenaxis has fully complied with, and exceeded, the Court’s Order, and CryoLife’s Motion to Compel should be denied. In addition, CryoLife’s baseless and harassing Motion for Sanctions should also be denied.

## II. INTRODUCTION

Tenaxis has fully complied with the Court’s January 13, 2009 Order.

That CryoLife is frustrated with the discovery it has received from Tenaxis is clear from the tone of its opening memorandum. What is unclear from CryoLife’s hyperbole is that CryoLife itself is solely responsible for its frustration. CryoLife may now wish that it had propounded different discovery requests from those actually propounded, but Tenaxis is responsible only for producing documents responsive to CryoLife’s actual requests, not those that Cryolife now wishes it had propounded.

That said, in a good faith effort to address CryoLife’s expanded requests, and also to save this Court and the parties’ resources, Tenaxis has already produced documents in excess of that

townsend.

dictated by the Court's Order and has already agreed to make available Tenaxis' President and Chief Executive Officer for a broader deposition than that required by the Court's Order. Thus, CyroLife's Motion to Compel is unfounded, wasteful, misstates the record, and omits several important facts. CryoLife's Motion to Compel should be denied.

CryoLife's new, broader requests go well beyond the "exceptionally narrow" and "tailored" requests CryoLife initially sought and argued to this Court to propound. Indeed, it is facially apparent that CryoLife has broadened its request from "documents **sufficient to show** starting materials used in the manufacture of, and the final composition of, ArterX …" to:

- (2) Documents sufficient to show the starting materials and final composition of the German ArterX product, including, but not limited to, documents sufficient to show **all known details** regarding the final chemical composition, documents sufficient to show **all known details** regarding the "modified glutaraldehyde" component, and documents sufficient to show **all known details** regarding the relative amounts by volume and weight of each components;[1] and

- (3) ***A certification confirming*** that the documents Tenaxis Medical, Inc. has produced to CryoLife, Inc. encompasses **all known details** regarding the starting materials and final composition of ArterX, including, but not limited to, the final composition, the "modified glutaraldehyde" component, and the relative amount by volume and weight of each component.

CryoLife's Notice of Motion and Motion to Compel, page 2 (emphasis added). CryoLife also seeks an additional, technical witness to testify as to the very particular, proprietary and technical details of the starting materials and the final composition of ArterX, including the "modified glutaraldehyde" component, that far exceed the parameters of CryoLife's initial requests and the Court's January 13, 2009 Order.

Tenaxis has already produced additional documents to satisfy most of CyroLife's belated, additional requests, and has agreed to produce the President and CEO of Tenaxis to further testify as to the technical details of ArterX™ Vascular Sealant in a good faith effort to resolve the

[1] Tenaxis does not comprehend how CryoLife can stretch its original request this far, and indeed to include "whether [any compounds include] the so-called "pyridine complex" disclosed in the Dieck Patent…." CryoLife's Motion to Compel, page 10, lines 3-4. This new level of detail may **now** be desired by CryoLife, but it was **not** originally requested.

parties' disputes.[2] CryoLife, on the other hand, continues to propound hyperbolic demands and threats rather than participate in a meaningful meet and confer process and clearly define the particular additional documents and deposition topics it now seeks.

CryoLife's entire motion is based on the faulty premise that its original document request for "documents sufficient to show" really meant documents showing "all known details" of the various parameters and each of the underlying components of the final composition of ArterX, none of which were delineated to Tenaxis before March 3 or to this Court before this motion. As CryoLife's premise is faulty and blatantly inaccurate, its motion must fail.[3]

## III. STATEMENT OF THE RELEVANT FACTS

### A. Status of the German Action

This is not a full-fledged, long-running, U.S. patent infringement lawsuit. Rather, it is a Miscellaneous Action filed by CryoLife in November 2008 under 28 U.S.C. § 1782 to obtain limited discovery from Tenaxis for use in a German patent infringement litigation. The German patent infringement action, filed in Düsseldorf, Germany (the "German Action"), is still in its nascent stages. CryoLife filed its complaint in the German Action on October 30, 2008. Spaeth Decl., ¶ 2. Since then, the German Court has held a scheduling hearing (on March 17, 2009), setting the deadlines for Tenaxis' response to CryoLife's complaint as July 20, 2009, and CryoLife's further response as November 16, 2009. Spaeth Decl., ¶ 2.

### B. Tenaxis' Complete Production and Deposition

After the January 13, 2009 hearing and Order of this Court, Tenaxis gathered and produced to CryoLife documents to satisfy the document production portion of the Court's Order. In particular, Tenaxis produced to CryoLife the following documents responsive to all three categories requested and ordered:

---

[2] Prior to CryoLife's instant motions, Tenaxis agreed to make Dr. Ronald Dieck, its President and CEO, available for deposition in Palo Alto, California on any of April 23 or 24, or May 7, 8, 14 or 15. Declaration of Susan M. Spaeth in Support of Tenaxis Medical, Inc.'s Opposition to CryoLife, Inc.'s Motion to Compel ("Spaeth Decl."), ¶ 31, Exhibit 24. As Tenaxis has fewer than 15 employees, it would be a hardship for Dr. Dieck's deposition to be held in Atlanta, Georgia, as CryoLife seeks. Spaeth Decl., ¶ 31.

[3] CyroLife's Motion for Sanctions is even more egregiously based and also must be denied. See Tenaxis' Opposition to CryoLife's Motion for Sanctions, filed this same date.



townsend.

- Documents sufficient to show starting materials used in the manufacture of, and the final composition of, ArterX Vascular Sealant sold in, made in, shipped to, imported in, offered for sale in, or used in Germany (hereinafter the "German ArterX product");

    - Tenaxis produced its Highly Confidential REDACTED which lists every single ingredient used to manufacture ArterX, even the box it is packaged in and the labels that go on the final packaging. See Exhibit 2,[4] TEN0092. There can be no doubt that the REDACTED for the ArterX product is sufficient to show the starting materials used in the manufacture of ArterX Vascular Sealant.

    - Tenaxis produced its Highly Confidential REDACTED (which it had previously provided to the FDA) – that is, a description of the ArterX formulation showing all of the ingredients of the final composition of ArterX, including the relative amounts of each ingredient, and also showing which ingredients were in each of the two barrels of the double-barreled syringe. See Exhibit 3, TEN0093. There can be no doubt that the description showing all of the ingredients of the final composition of the ArterX formulation, and the relative amounts of each ingredient, is sufficient to show the final composition of ArterX Vascular Sealant.

- Marketing brochures and advertisement, if any, sufficient to prevent Tenaxis from contesting that it offers the ArterX product for sale in Germany;[5] and

    - Tenaxis produced a print out of the pages of its website which includes, among other things, the name of Tenaxis' German distributor, Lamed GmbH. See Exhibit 4, TEN0001-0023, and in particular TEN0017 (showing the name and address of Lamed GmbH).

    - Tenaxis produced a full-color two-sided brochure captioned, "Time is No Longer an Issue," which Tenaxis makes available to its German distributor, Lamed GmbH. See Exhibit 5, TEN0024-TEN0025.

    - Tenaxis produced an actual "ArterX™ Vascular Sealant Instructions for Use," included with the actual ArterX product, which includes Instructions for Use in German, as well as in English and five other languages. See Exhibit 6, TEN00028-TEN0091.

- A sample of each package size or type of the German ArterX product (including product packaging, accompanying applicator, and any accompanying paper or inserts).

---

[4] The exhibits are attached to the Spaeth Decl. unless otherwise indicated.

[5] The second document category, as well as the second deposition category, was modified in the Court's January 13, 2009 Order from that originally requested by CryoLife. Tenaxis has identified both categories as ordered by the Court. See Exhibit 1 (Order).



townsend.

- Tenaxis produced a sample ArterX Vascular Sealant product, which comes in a double-barreled syringe and with all product packaging and accompanying papers. See Exhibit 7, TEN0026-TEN0027 (ArterX sample product and package) and Exhibit 6, TEN0028-TEN0091 (ArterX Instructions for Use, identified above).

Tenaxis' document production was largely complete by February 11, 2009 and finally complete by February 24, 2009.[6] Spaeth Decl., ¶ 10. At least by February 25, 2009, CryoLife had in its possession Tenaxis' Highly Confidential REDACTED listing all of the starting materials for ArterX, and Tenaxis' Highly Confidential REDACTED describing the final composition of ArterX, providing the relative amounts of each ingredient and identifying which ingredients are in each of the two barrels of the double-barreled syringe. See Spaeth Decl., ¶¶ 4, 5, 10. Thus, well before the deposition, Tenaxis had met its obligation to produce documents "sufficient to show" the starting materials used in the manufacture of, and the final composition of, ArterX.

On March 3, 2009, Tenaxis also made available for deposition David Smith, Tenaxis' Chief Operating Officer, who testified on the following topics:

- The starting materials and final composition of the German ArterX product;
- Marketing brochures and advertisement, if any, sufficient to prevent Tenaxis from contesting that it offers the ArterX product for sale in Germany; and
- The whereabouts of any German ArterX product.

David Smith is the person **most** knowledgeable about the second and third deposition topics, and he has knowledge about the first deposition topic.[7] Spaeth Decl., ¶ 11. Thus, Tenaxis properly designated Mr. Smith as its 30(b)(6) deponent.

---

[6] Tenaxis produced all of the above listed documents, except for the REDACTED and the REDACTED on February 11, 2009. Spaeth Decl., ¶ 10. Tenaxis immediately produced its REDACTED and REDACTED – both marked "Highly Confidential" under the Protective Order – the same day the final proposed Protective Order was agreed-upon by CryoLife and Tenaxis and filed by CryoLife, February 24, 2009. Spaeth Decl., ¶ 10.

[7] CryoLife's Opening MPA misrepresents the preparations Mr. Smith undertook to prepare himself for the deposition. Even within the transcript itself, Mr. Smith testified he had reviewed all of the documents Tenaxis produced and was previously generally familiar with them even before preparing for the deposition. Exhibit 8 (Smith Depo., 16:2-10).



townsend.

At no time before the March 3 deposition had begun did CryoLife raise any issue that it believed Tenaxis' document production was deficient in any way. Spaeth Decl., ¶ 13. While CryoLife asserts that it did not "discover" that the documents "provided only limited information regarding the starting materials and final composition of ArterX" until it took the deposition of Mr. Smith, CryoLife's Opening MPA at 1:7-9, such a representation is absurd on its face. CryoLife was fully aware of the full content of the documents on the day it received them.

Likewise, at no time before the March 3 deposition did CryoLife even ask for the name of Tenaxis' intended deponent. Spaeth Decl., ¶ 13. Thus, Tenaxis appeared for the 30(b)(6) deposition ready to provide deposition testimony as to the deposition topics and regarding the documents produced.[8]

**C. CryoLife's March 3 Tactics**

Tenaxis appeared for deposition on March 3 as the parties agreed, with David Smith appearing as Tenaxis' witness. As the deposition progressed, it became clear that CryoLife intended to ask questions far broader than the scope of the ordered deposition topics, and of a very technical nature. For example, CryoLife asked very detailed technical questions regarding the chemical structure of various ArterX Vascular Sealant components, what the REDACTED did to the starting materials, which patents might cover the ArterX Vascular Sealant product, etc. See*, e.g.,* Exhibit 8 at 70:1-72:3 and 82:9-92:11. None of these questions were within the scope of the deposition topics, and many of them called for expert testimony. *Id.* Most of the technical questions were also vague and ambiguous, as if CryoLife's counsel may not have understood the questions he was asking. In addition, CryoLife also asked whether Tenaxis had licensed technology from a particular third party or if Tenaxis had any relationship with that third party. Exhibit 8, at 85:16-86:7 and 89:16-21. Again, none of these questions were within the scope of the deposition topics.

For example, there is no reference whatsoever in CryoLife's November 2008 requests for documents or information related to the process Tenaxis uses to make ArterX, to any particular in-

[8] Even CryoLife does not dispute the completeness of Tenaxis' production and deposition testimony on the second and third production and testimony categories. Thus, CryoLife's unfounded assertions are limited to one of the production and one of the testimony categories.



townsend.

process testing that Tenaxis may perform, to any patent coverage of ArterX or to the very detailed information CryoLife started asking about on March 3. See Exhibit 25 (CryoLife, Inc.'s Petition for Discovery Under 28 U.S.C. § 1782(a), dated November 10, 2008). Likewise, there is no reference in CyroLife's requests seeking documents or information related to any licenses or commercial relationships Tenaxis may have entered into. *Id.*

Moreover, Tenaxis could not have guessed that CryoLife would seek to broaden its requests from documents and information "sufficient to show" the starting materials and final composition of ArterX to the scope of documents and information it now seeks. Instead, Tenaxis properly prepared and presented a witness to testify on the deposition topics and the documents Tenaxis produced.[9]

**D. CryoLife's So-Called Meet and Confer Process**

Rather than admit its March 2009 requests seek documents and information broader than those it sought and received between November 2008 and February 2009, and asking for additional documents and information in a reasonable manner, since March 3, CryoLife has made an insistent and unwarranted attack on Tenaxis. See Exhibit G to the Declaration of Kristin E. Goran in Support of CryoLife, Inc.'s Motion to Compel. During and after the March 3 deposition, CryoLife has thrashed out threats of motions to compel and motions for sanctions. *Id.* Much of the hyperbolic correspondence from CryoLife over the past month has been difficult to decipher and Tenaxis has repeatedly sought clarification as to the specifics of the information CryoLife still seeks. *Id.* However, because of CyroLife's insistence to (1) impossibly twist its additional requests into something that would fall under "documents sufficient to show" the starting materials and final composition of ArterX, and (2) attempt to blame Tenaxis for not fulfilling CryoLife's revised and broadened requests – which had never been formally requested before March – this has been difficult. Spaeth Decl., ¶ 15.

---

[9] REDACTED

townsend.

Tenaxis has been wondering the answer to this question: If it was so clear that CryoLife's request for "documents sufficient to show" certain information entailed the detailed and expanded amount of information CryoLife now asserts, why did not CryoLife inform the Court and Tenaxis of CryoLife's desired scope in its November and December 2008 request and arguments to the Court, or in its January 2009 oral argument, or after CryoLife received Tenaxis' February productions? The answer is one of two things: Either CryoLife deliberately misled the Court and Tenaxis by specifying limited requests and representing they were "exceptionally narrow" and "tailored" (see Exhibit 27 (Reply Memorandum of Law in Support of CryoLife, Inc.'s Petition for Discovery Under 28 U.S.C. § 1782(a), filed December 31, 2008)), or, CryoLife was ill-prepared to serve its initial requests in November, was still unprepared in February when it received Tenaxis' production, and only realized it really wanted additional information as it prepared to take the March 3 deposition with its German counsel. Tenaxis is completely blameless – and substantially justified – under either scenario.

**E. Tenaxis' Additional Productions and Agreements**

Although Tenaxis firmly believed, and continues to believe, that it had fully complied with its discovery obligations, in good faith Tenaxis agreed to produce, and has produced, to CryoLife additional detailed, technical information since March 3. Tenaxis did not agree to this expanded production because it doubted the completeness of its original production – Tenaxis' February production fully complied with the Court's Order. Instead, Tenaxis agreed to expand its production in an attempt to compromise with CryoLife without the need to expend additional resources of the Court and the parties.

Before CryoLife even filed its motion, on March 19, 2009 in a good faith effort to address CyroLife's additional requests, Tenaxis already produced to CryoLife additional documents:

- Tenaxis produced the Highly Confidential REDACTED



REDACTED

- Tenaxis produced the Highly Confidential REDACTED
- Tenaxis produced the Highly Confidential REDACTED
- Tenaxis produced Highly Confidential information REDACTED
- Tenaxis produced Highly Confidential information REDACTED

The Highly Confidential Specifications of the starting materials provide explicit details of each ingredient used in the manufacture of ArterX, such as the REDACTED The Specifications also provide REDACTED This detailed information goes well beyond "documents sufficient to show" the starting materials used to manufacture ArterX, but Tenaxis has produced it in good faith.

The Highly Confidential REDACTED describes the final product specifications for ArterX, including the REDACTED , but does give explicit details as to the above-listed parameters of the final ArterX product and illustrates to CryoLife the types of testing actually done on the final ArterX product. *Id.* Therefore, although this information far exceeds anything CryoLife formally requested in its document requests, Tenaxis also produced this document to CryoLife in good faith.

Likewise, the Highly Confidential REDACTED



townsend.

REDACTED documents all provide information well beyond that "sufficient to show starting materials used in the manufacture of, and the final composition of, ArterX." See Exhibits 21-23. They provide additional information about the preparations and amounts of REDACTED As with the above documents, Tenaxis produced these additional documents in a good faith effort to meet CryoLife's additional demands and to avoid unnecessary legal fees and burdening the Court.

As Tenaxis has understood CryoLife's belated requests, Tenaxis has endeavored to determine if there is information that is responsive to such requests. However, many of CryoLife's complaints are nonsensical (i.e., CryoLife complains that the REDACTED, while completely ignoring the additional components listed in the final ArterX product). At this stage, Tenaxis is uncertain whether anything short of each and every technical document would satisfy CryoLife's expanded requests for production and for certification[11] that its production encompasses "all known details," especially in light of CyroLife's misrepresentations to the Court regarding Tenaxis' total production.[12]

Thus, Tenaxis asks the Court to confirm the sufficiency of Tenaxis' production and to put a stop to CryoLife's ever-expanding demands. If CryoLife wishes to supplement its discovery requests, it must do so in the manner provided for by the Federal Rules (or the Rules of the German system, where CryoLife chose to file its complaint).

---

[10] REDACTED

[11] CryoLife's requested "certification" from Tenaxis is particularly harassing, given CryoLife's initial arguments it was seeking "exceptionally narrow" discovery.

[12] CryoLife continues to ask for more and more detailed technical, and highly proprietary, information about ArterX, including information **not** related to the claims at issue in the German Action (*e.g.*, what patents cover Tenaxis' ArterX, what commercial relationships has Tenaxis entered into, etc.). While there is a Protective Order in place, CryoLife is Tenaxis' major competitor, and has no right to such highly proprietary and confidential information of Tenaxis. The Court should not countenance such blatant fishing for competitive information that is not pertinent to the German Action.



townsend.

## IV. ARGUMENT

### A. Tenaxis Has Fully Complied With CryoLife's Discovery Requests and the Court's Order

CryoLife represented to the Court in its opening papers it was not seeking broad discovery, but "exceptionally narrow, tailored" discovery:

> Finally, Petitioner's discovery request is not unduly intrusive or burdensome. To the contrary, the requested discovery is exceptionally narrow, tailored to produce specifically identified evidence, namely, product composition, sales and marketing, and product location(s) evidence that is highly relevant to the key issues.

Exhibit 26 (Memorandum of Points and Authorities in Support of CryoLife's Petition for Discovery, filed November 10, 1008), at page 7, line 26 to page 8, line 2.

CryoLife repeated this representation to the Court in December:

> CryoLife's requested discovery is exceptionally narrow, tailored to produce specifically identified evidence, namely, product composition and evidence of marketing in Germany, evidence that is highly relevant to the key issues.

Exhibit 27 (Reply Memorandum of Law in Support of CryoLife, Inc.'s Petition for Discovery Under 28 U.S.C. § 1782(a), filed December 31, 2008), page 9, lines 2-4. Tenaxis took CryoLife at its word and produced documents and prepared a witness according to the scope of CryoLife's specific requests. Since March 3, Tenaxis has also produced additional documents.

As set forth more fully above, Tenaxis has fully complied with CryoLife's actual discovery requests and the Court's January 13, 2009 Order. CryoLife sought documents sufficient to show the staring materials used in the manufacture of ArterX. Tenaxis produced the REDACTED identifying each and every ingredient used to manufacture ArterX. Tenaxis has also produced the specifications for each such ingredient. CryoLife sought documents sufficient to show the final composition of ArterX. Tenaxis produced a description of the ArterX formulation showing all of the ingredients of the final composition of ArterX, the relative amounts of each such ingredient, and which ingredients are in each of the two barrels of the double-barreled syringe. Tenaxis has also produced the REDACTED which describes the final product specifications for the Tenaxis ArterX Vascular Sealant. In addition, Tenaxis has produced



townsend.

specifications for the chemical properties and manufacturing tolerances of REDACTED as well as information regarding the preparations of the solutions in the two barrels of its syringe, REDACTED. CryoLife sought marketing brochures and advertisements, which Tenaxis produced, and about which CryoLife does not complain. CryoLife sought a sample of each package size or type of the German ArterX product, which Tenaxis produced.[13]

CryoLife also sought a witness to testify regarding the starting materials and final composition of ArterX, and Tenaxis produced a witness who could testify as to the scope of the relevant documents on this topic. CryoLife also sought a witness to testify regarding marketing brochures and advertisements, and the whereabouts of any German ArterX product. Tenaxis' designated witness was the person most knowledgeable about these topics, and CryoLife does not complain about the sufficiency of the deposition on these topics. In addition, Tenaxis has offered to provide an additional, technical witness to answer further questions regarding the starting materials and final composition of ArterX.

In short, CryoLife's new complaints can only be attributed to the apparent inadequacies of CryoLife's own document requests and deposition topics, since Tenaxis has fully complied with CryoLife's formal requests and the Court's order. Indeed, Tenaxis has surpassed its discovery obligations in an effort to cooperate with CryoLife and avoid wasting the Court's time.

### B. CryoLife is the Cause of Any Discrepancies Between What It Now Seeks and What It Originally Requested

While U.S. discovery can be broad, the Federal Rules of Civil Procedures require that discovery requests:

> (A) must describe with reasonable particularity each item or category of items to be inspected.

Fed. R. Civ. P. Rule 34(b)(1)(A); *see also*, Fed. R. Civ. P. Rule 30(b)(6) (a party "must describe with reasonable particularity the matters for examination."). Thus, it was for CryoLife to describe

[13] CryoLife has since also requested five or six additional product samples (Spaeth Decl., ¶ 35; Exhibit 28), again illustrating CryoLife's ever-expanding requests.



townsend.

with reasonable particularity the scope of discovery it was requesting. It was not for Tenaxis to guess that CryoLife meant to request more than the requests did on their face.

CryoLife, not Tenaxis, is the cause of any discrepancies between what CryoLife **now** wishes it had asked for and obtained and the information it originally sought. Tenaxis fulfilled its obligations by producing documents responsive to the original requests and providing a witness prepared to testify as to the scope of the original topics and production documents. Tenaxis had no obligation to guess that CryoLife really wanted more than the "exceptionally narrow" and "tailored" information which it originally sought and for which it argued. As discussed above, CryoLife knew the full scope of Tenaxis' production in February and did not object or suggest Tenaxis' production was not complete then. Thus, only CryoLife understood both its own position as to the scope of CryoLife's requests and Tenaxis' position (as evidenced by Tenaxis' production). Tenaxis was unaware that CryoLife might disagree with Tenaxis' production **because CryoLife did not tell Tenaxis that CryoLife viewed Tenaxis' production scope as deficient!**

Further, as two of the three deposition topics concerned marketing and distribution topics, Tenaxis' designation of the person responsible for such activities – since he also has knowledge of the list of starting materials and the final composition of ArterX – was proper.[14] If CryoLife expected a technical witness to appear at the 30(b)(6) deposition to discuss broader and more in-depth technical topics than those described in CryoLife's deposition requests or derived from the documents Tenaxis produced, CryoLife should have mentioned this to Tenaxis in advance of the deposition. **Instead, CryoLife chose to go forward with the deposition without giving Tenaxis any indication that CryoLife viewed Tenaxis' production as deficient or that CryoLife expected a technical witness to testify as to "all known details" of the starting materials, final composition, and modified glutaraldehyde.**

---

[14] Tenaxis agrees it has an obligation to produce one or more witnesses prepared to testify on the identified topics. As Tenaxis read and understood the topics, and in accord with CryoLife's explicit and tacit representations as to the scope of its requests, Tenaxis met its obligation. Nevertheless, assuming the Court would expect the parties to be reasonable, Tenaxis agreed to produce a second, technical deponent.



townsend.

townsend.

**C. CryoLife Improperly Seeks to Equate "Relevance to the German Action" With the Scope of its Original Request**

CryoLife now seeks all technical documents relevant to ArterX, even documents not pertinent to the German Action. It specifically argues that Tenaxis should produce certain information as it would be "relevant to the German Action" (see CryoLife's Opening MPA, page 8, line 14 – page 9, line 3), presumably as an attempt to expand its actual requests to the broader requests it now seeks. However, that is not the scope of documents CryoLife originally sought, or the Court ordered, in this miscellaneous action.

CryoLife could have asked for more detailed information about ArterX from the start, as it already knew that Tenaxis used a unique cross-linking agent, as it attached a copy of Tenaxis' brochure mentioning the same to its Petition. CryoLife could have asked about the manufacturing process for ArterX (although that would have been irrelevant and improper – even though CryoLife now seems to be asking for such information). CryoLife also could have asked what patents covered ArterX. CryoLife also could have asked if any third party technology was licensed for use with ArterX. CryoLife chose to request none of this information – either because the information was not necessary to the German Action, or for CryoLife to be able to represent to the Court the apparent "reasonableness" of its original request. It was not for Tenaxis to *sua sponte* respond to phantasmic and unarticulated document requests.

Moreover, this miscellaneous action is not the type of action where a broad range of discovery was either requested or ordered. Nor is it the type of case wherein other activities would have somehow informed Tenaxis that CryoLife really meant to ask for more in-depth documents than it facially requested. The parties are not involved in any U.S. patent litigation matter and there is no parallel discovery in the German Action. The cases cited by CryoLife stand for general discovery principles, but fail to address the situation before the Court in this type of limited action and where, as here, a party met its original obligations, already provided additional documents and already agreed to produce a second deponent. Both *PostX Corporation v. Secure Data Motion, Inc.*, 2005 WL 767593 (N.D. Cal.), and *Detoy v. City and County of San Francisco*, 196 F.R.D. 362 (N.D. Cal. 2000), are full-fledged lawsuits where the scope of the 30(b)(6) deposition of a

main litigant in a substantive, on-going case is at issue. Much of the dicta in *Detoy*, which discusses the split in case law regarding how far outside the scope of the 30(b)(6) topics a deposition may go, is irrelevant to this limited action. Moreover, unlike the facts in *PostX*, Tenaxis already agreed to make a second 30(b)(6) deponent available.

Again, while CryoLife now seeks to twist its original, limited discovery requests into a very broad obligation by Tenaxis, the scope of CryoLife's actual original requests defines Tenaxis' true obligations. Tenaxis has exceeded its discovery obligations in this matter.

## V. CONCLUSION

Tenaxis has met its original discovery obligations. In addition, Tenaxis has already further produced more detailed technical documents and agreed to produce its CEO for deposition in Palo Alto, California. Therefore, Tenaxis has exceeded its obligations and there is nothing to compel. CryoLife's Motion to Compel should be denied.

DATED: April 14, 2009

Respectfully submitted,

TOWNSEND AND TOWNSEND AND CREW LLP

By: /S/ Susan M. Spaeth
Susan M. Spaeth

Attorneys for Respondent
TENAXIS MEDICAL, INC.

61890020 v1

townsend.